48

**UNITED STATES, Appellee,**

v.

**Daniel W. LAYNE, Staff Sergeant, U.S. Marine Corps, Appellant.**

**No. 61,001.**

**NMCM 86 4805.**

U.S. Court of Military Appeals.

Sept. 26, 1989.

For Appellant: *Douglas W. Grinnell, Esq., Lieutenant Commander L. Saccoccio, JAGC, USN, Lieutenant Susan K. Milliken, JAGC, USN* (on brief); *Captain A. R. Philpott, JAGC, USN,* and *Lieutenant Colonel A.J. Roach, USMC.*

For Appellee: *Captain Wendell A. Kjos, JAGC, USN,* and *Lieutenant Commander Lawrence W. Muschamp, JAGC, USN* (on brief); *Lieutenant Scott A. Hagen, JAGC, USNR,* and *Lieutenant Eralides E. Cabrera, JAGC, USNR.*

*Opinion of the Court*

COX, Judge:

On August 18, 1986, appellant was tried by special court-martial without members. Contrary to his pleas, he was found guilty of violating Articles 81, 92, 107, 112a, and 134, Uniform Code of Military Justice, 10 USC §§ 881, 892, 907, 912a, and 934, respectively, by conspiring to evade and compromise a random urinalysis test; disobeying a lawful order to submit a specimen of

his urine; making a false official statement by providing a false urine specimen; wrongfully using marijuana; and evading and compromising lawful urinalysis testing. He was sentenced to receive a bad-conduct discharge, confinement for 3 months, forfeiture of $200.00 pay per month for 5 months, and reduction in grade to E–1. The convening authority approved the sentence as adjudged.

The Court of Military Review concluded that the record of trial was insufficient to prove that appellant was guilty of failing to provide a urine specimen as ordered. Accordingly, the findings of guilty to that offense and the related crimes (false statement and compromising a urinalysis) were set aside. Upon reassessment of the sentence, the court approved a bad-conduct discharge, confinement for 2 months, forfeiture of $200.00 per month for 3 months, and reduction to pay grade E–3.

We granted appellant's petition for review [1] to determine whether the evidence of marijuana use adduced from analysis of his urine was admissible and to examine the sufficiency of the evidence to support his conviction for conspiracy.[2]

This case emanated from an order issued by the Commanding Officer (Major Richards), United States Marine Corps Recruiting Station, East Lansing, Michigan, on April 29, 1986, which prescribed sweep-urinalysis testing "in conjunction with" an "all hands meeting." Major Richards sub-sequently learned that the results of the tests might have been compromised by the efforts of appellant, Sergeant George, and Corporal Conklin. He first became aware of this possibility on May 2, 1986, when the Executive Officer, Captain Rowe, advised him of information received via the chain-of-command from Corporal Rau.[3] Rau had observed appellant and Sergeant George "smoking marijuana" about 2 weeks before. By pretending to be concerned about the results of his own urinalysis, he had elicited information that led him to believe appellant and Conklin had some method for controlling the apparent results of sweep-urinalysis testing.

Understandably concerned about this accusation, Major Richards informed his commanding officer. He also decided to interview Corporal Rau on the following Monday. During this interview, Rau informed Major Richards that he had concluded from his conversations with Corporal Conklin that Conklin and Sergeant George had removed their own urine samples and appellant's from the safe where they were stored and substituted other urine before the samples were mailed away for testing. Among other things, Rau told Major Richards that urine samples from civilians had been substituted for that of the conspirators and that he (Rau) had been informed that they (Conklin and George) "hoped ... [he] was smart enough not to say anything

---

1. Supplementary Special Court–Martial Order No. 6–88 dated 21 Jun 1988 prematurely orders the discharge executed. Therefore, it is a nullity.

2. The issues granted review are:

   I
   WHETHER THE EVIDENCE PRODUCED AT A SUPPOSEDLY "RANDOM" URINALYSIS IS ADMISSIBLE NOTWITHSTANDING THE FACT THAT THE URINE OBSERVER PLACES SPECIAL MARKS ON THE BOTTOM OF THE ACCUSED'S SPECIMEN BOTTLE; I.E., IS *UNITED STATES V. HILLMAN*, 18 MJ 638 (NMCMR 1984), APPROPRIATE LAW?

   II
   ARE THE RESULTS OF A SO–CALLED "RANDOM" URINALYSIS ADMISSIBLE WHEN THE URINALYSIS IN QUESTION IS ACTUALLY A "RE–OPENING" OR "EXTENSION" OF A RANDOM URINALYSIS HELD, AND COMPLETED, SIX DAYS EARLIER AND "RE–OPENED" OR "EXTENDED" BECAUSE THE COMMAND SUSPECTS THAT SOMEHOW THE EARLIER URINALYSIS WAS SABOTAGED?

   III
   DID PROBABLE CAUSE EXIST IN THIS CASE ON 5/06/86 TO PERMIT THE SEARCH OF APPELLANT'S URINE?

   IV
   WAS THERE SUFFICIENT EVIDENCE IN THIS CASE TO CONVICT APPELLANT OF "CONSPIRACY" ON 4/28/86 TO EVADE AND COMPROMISE AN UPCOMING URINALYSIS?

3. Corporal Rau had been promoted to Sergeant by the time of trial.

about this."[4] Major Richards was familiar with Rau, and because of that personal knowledge, as well as reports from other Marines in the recruiting station, he believed Rau to be credible.

Based on the information Rau provided, Major Richards decided to order another urinalysis of all Marines in the Recruiting Station headquarters element. Every person, including Major Richards himself, submitted to this second urinalysis, and it was monitored by Captain Rowe. The samples were provided under the direct supervision of Master Sergeant Kelly, who took each one individually to Captain Rowe. Rowe marked the bottles containing the samples of appellant, Conklin, and George with blue circles.[5] After the urine specimens were tested by a certified drug-testing laboratory, appellant's was found to contain metabolites of THC, the psychoactive ingredient of marijuana.

■ We hold that the results of this second urinalysis were admissible as the fruit of a search based on probable cause. Major Richards had every reason to believe Corporal Rau's report. He knew Rau personally from both direct contact with him and his reputation within the Recruiting Station, and he believed Rau to be truthful. There is no evidence that Rau had any animosity toward appellant; indeed, they had been friends at one time. In such circumstances, a commander may give great weight to information supplied by an accountable "citizen informant." *United States v. Wood*, 25 MJ 46, 48 (CMA 1987);

*see also United States v. Land*, 10 MJ 103 (CMA 1980).[6] Thus, we conclude that Major Richards had probable cause to believe that the urinalysis had been compromised by appellant and others, and he properly ordered a search to determine the reason for the compromise.[7]

■ Appellant also contends that there is insufficient evidence to sustain his conviction for conspiring with Sergeant George and Corporal Conklin to compromise the April 29 urinalysis. However, under a grant of immunity, Conklin testified that he approached Sergeant George and voiced his concerns about the urinalysis due to his use of diet pills, which might be revealed in the examination of his urine.[8] George suggested that he should discuss his problem with appellant. Conklin did consult with appellant and repeated his fears about the upcoming inspection. In Conklin's own words, he told appellant he "was paranoid" about being detected as a substance abuser, which might result in the termination of his career. Appellant told Conklin he would "think about" it. Conklin then left appellant's office intending to return. Later in the day, Conklin was again in appellant's office. After some other conversation, appellant told him to be at Sergeant George's house after work.

Conklin lived in an apartment near Sergeant George's house. After the duty day, he visited the latter. Appellant also came to the apartment. Following some general conversation, Conklin asked appellant what

---

**4.** Appellant's pleadings repeatedly assert that the record is silent as to the conversations between Corporal Rau and Major Richards. However, both testified as to the substance of the interviews.

**5.** Appellant's brief refers to blue triangles. Captain Rowe testified that he marked the bottles with a circle, but all parties agree that the urine sample provided by appellant was specially marked.

**6.** We also note in passing that a false report of a crime by a member of the military is made criminal by Article 107, Uniform Code of Military Justice, 10 USC § 907. *See United States v. Collier*, 23 USCMA 173, 175, 48 CMR 789, 791

(1974). Thus, Major Richards had an additional reason for believing the truth of Corporal Rau's information.

**7.** Because we conclude that Major Richards had probable cause to order a search, we need not address the remaining granted issues related thereto. In passing, however, we note that the first assignment was not litigated at trial and was thus waived. *See* Mil.R.Evid. 103, Manual for Courts–Martial, United States, 1984.

**8.** Conklin had received nonjudicial punishment (Art. 15, UCMJ, 10 USC § 815) for his part in the offense. George had also received nonjudicial punishment and was reduced to Corporal.

they were "going to do about this." Appellant then produced two bottles of urine.

Conklin was the observer for the urinalysis conducted on April 29. As such he had access to the bottles containing the collected urine and knew which bottle number had been assigned to each Marine in the Recruiting Station. He was also the Marine who mailed the filled bottles to the laboratory for analysis. When he mailed the urine, he renumbered an empty bottle with the figure assigned to him for this inspection and refilled it with the urine provided by appellant. Sergeant George brought a second bottle containing urine to Conklin at that time, and Conklin switched it with the one used during the sweep.

Sergeant George testified that he remembered very little about the conversations between him, Conklin, and appellant. However, he did remember that both Conklin and appellant were at his home on the evening before the April 29 urinalysis. Conklin brought two urinalysis bottles with him, and appellant brought some urine. This urine was to be substituted for urine specimens that would be collected during the urinalysis. That switch was in fact made the following day.

Appellant testified that he had given some urine to Corporal Conklin, but that this urine was his own. He said he believed that Conklin was going to use the urine for some form of deviant sex practice. He did admit that Conklin had told him that he was worried about the upcoming urinalysis and asked for urine. However, when pressed, he attempted to retract this testimony.

■ Appellant argues that, because this evidence did not show a specific agreement to use the urine he provided to evade detection in the urinalysis, he cannot be convicted of conspiracy to compromise the results of that test. However, it is so well-settled as to be trite that the "agreement in a conspiracy need not be in any particular form or manifested in any formal words." Para. 5c(2), Part IV, Manual for Courts-Martial, United States, 1984. The conduct of the parties to the conspiracy is sufficient to show the agreement required to establish the offense.

In many aspects, this case is similar to *United States v. Jackson*, 20 MJ 68 (CMA 1985). There, the accused had accompanied another sailor to the barracks of the victim, ostensibly for an innocent purpose. However, when he discovered his companion looting a barracks room, he helped him remove the contents, ultimately receiving a portion of the proceeds derived from pawning a television set they had taken. Although no specific words were spoken to show a conspiracy, the acts themselves demonstrated an agreement to steal the television.

Similarly, the evidence in this case shows that Corporal Conklin went to appellant to express his concern about the upcoming urinalysis. Appellant told him to meet him at Sergeant George's house that evening. At that meeting appellant—by his own admission—brought a container of urine, which was utilized by Conklin and George as a substitute for their own. Furthermore, Corporal Conklin testified that none of the Marines had any doubt about the ultimate use to be made of the urine. While none of the actors stated an intent to join in a given crime, there is clear evidence of concerted action to accomplish a criminal act, thus establishing a violation of Article 81.

The decision of the United States Navy-Marine Corps Court of Military Review is affirmed.

Chief Judge EVERETT and Judge SULLIVAN concur.